Eliezer Drew (ED0625)
Grushko & Mittman, P.C.
515 Rockaway Avenue
Valley Stream, New York 11581
(212) 697–9500
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| YSN IMPORTS, INC. and ASHTEAD HOLDINGS INC., <br><br>               Plaintiffs, <br>    -against- <br><br> FEIGE "PEGGY" OBERLANDER, U SHIPPERS GROUP, INC., U SHIPPERS GROUP MANAGEMENT CO., INC. and GREEN NORTH AMERICA, INC. <br><br>               Defendants. | Index No. 20 cv 5981 <br><br> COMPLAINT |

Plaintiffs YSN Imports, Inc. ("YSN") and Ashtead Holdings Inc. ("Ashtead" and together with YSN each a "Plaintiff" and collectively the "Plaintiffs"), by their attorneys, Grushko & Mittman, P.C., as and for their complaint against Feige "Peggy" Oberlander ("Oberlander"), U Shippers Group, Inc. (the "Association"), U Shippers Group Management Co., Inc. ("Management"), and Green North America, Inc. ("Green" and together with Oberlander, the Association, and Green each a "Defendant" and collectively the "Defendants), respectfully allege as follows:

PARTIES

1.       Plaintiff YSN Imports, Inc. is a corporation formed under the laws of the State of Nevada with its principal office in California.

2.       Plaintiff Ashtead Holdings Inc. is a corporation formed under the laws of the State of California with its principal office Florida.

3.      Upon information and belief, Feige **"Peggy"** Oberlander is a natural person with a domicile in Kings County, New York.

4.      Upon information and belief, U Shippers Group, Inc. is a Delaware entity with its principal place of business in Kings County, New York.

5.      Upon information and belief, U Shippers Group Management Co., Inc. is a New York entity with its principal place of business in Kings County, New York.

6.      Upon information and belief, Green North America, Inc. is a New York entity with its principal place of business in Kings County, New York.

## JURISDICTION AND VENUE

7.      Jurisdiction is based on 28 USC §1332 in that the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of a state and citizens or subjects of a different state or foreign state.

8.      Venue is proper in this district because the Defendants are domiciled in this District.

## FACTUAL ALLEGATIONS

9.      Upon information and belief, on or about January 28, 2020, Oberlander formed Management and on or about January 29, 2020, Oberlander formed the Association.

10.      Upon information and belief, Oberlander is the sole equity holder of Management.

11.      Upon information and belief, Oberlander formed Association to be a Delaware non-stock corporation to engage in obtaining bulk shipping contracts with major shipping companies (e.g. Maersk and One) on behalf of the members of Association.

12.      Upon information and belief, Oberlander formed Management to be her management company to manage the affairs of Association as directed by her, the sole director of the Association.

13.     In early 2020, the world began becoming aware of a new virus spreading out of China, Covid-19.

14.     On February 3, 2020, the United States declared a health emergency regarding Covid-19.

15.     In early February 2020, Oberlander was introduced to Shmuel (Sam) Newman ("Newman"), one of the principals of YSN.

16.     On February 13, 2020, Oberlander sent an email to Newman containing information about the Association's services.  The information contained a representation that the Association will only charge a $55 fee per container which is built into the fee paid to the shipping company and remitted to the Association by the shipping company.  The material about the Association also represented that no other fees would be charged.

17.     On February 19, 2020, Oberlander again emailed Newman an application asking for YSN's shipping numbers, saying she needs YSN's shipping numbers to show shipping strength to negotiate rates with shipping lines.

18.     Newman replied by email with the executed application which stated that YSN estimated it would be looking for minimum of 750 containers.

19.      Oberlander responded acknowledging receipt of the application.  On February 24, Newman emailed Oberlander "a heads up.... it seems that rates are coming down because of the Corona-virus."  Oberlander replied asking Newman if he could make referrals to her business.

20.     On March 7, 2020, Governor Andrew Cuomo declares a state of emergency in New York related to Covid-19.

21.     On March 13, 2020, President Donald Trump declares Covid-19 a national emergency.

22.     On March 19, 2020, California declared a statewide stay at home order.

23.     On March 22, 2020, the New York Pause Program began and all non-essential workers in New York were required to stay home. By this point New York State had also closed, bars, restaurants, schools, etc.

24.     As a result of the shutdowns in United States and other countries, global economic activity was greatly reduced from April to July 2020.

25.     In response to this reduced activity, major shipping lines had significantly less business and reduced their capacity accordingly.

26.     After the February 25 email, the next time YSN heard from the Defendants was on May 20, 2020, when Oberlander called Newman requesting YSN provide zip codes YSN is shipping to so she can obtain shipping rates and present a big package to the carriers when negotiating prices.  YSN provided such information via email.

27.     On June 10, 2020, Oberlander emailed Newman that "We are in the final stages of launching our association. Please stand by."

28.     Beginning in July 2020, as economic activity ramped back up, shipping from China increased causing shortages in available space on the reduced capacity on the major shipping lines.

29.     On July 14, 2020 Oberlander emailed to Newman the membership enrollment agreement to become a Member of the Association.

30.     The membership enrollment agreement sets forth that there is only a $55 per container charge and specifically stated "no further amounts will be charged to the Member".

31.     On July 15, 2020, Newman executed the application and sent it back via email.

32.     On July 20, Oberlander emailed Maersk that YSN was a member of the Association and should be added to the Maersk system.

33.     On or about July 23, 2020, Newman introduced Dov Coleman ("D. Coleman), one of the principals of Ashtead to Oberlander via email.

34.     On or about July 27, 2020, Oberlander sent the sales brochures and sign up forms to D. Coleman.

35.     Oberlander stated that "all our booking requests are in a very high status desk and will **always** be accepted regardless of the open market situation" (emphasis in the original).

36.     On or about July 28 or 29, 2020 Oberlander and D. Coleman had a phone call to discuss the Association's program.

37.     The discussion pertained to shipping volumes as well as how many forty-foot equivalent unit ("FEU(s)") the contracts with the shippers allowed for.

38.     Oberlander verbally confirmed to D. Coleman that there would be a $55 per container fee and no other fees would apply for using the Association's service.

39.     They also discussed the details of the logistics for making bookings via the twill.net website.

40.     On July 29, 2020 D. Coleman, via email, introduced Oberlander to Katherine Lee ("Lee") who handles Ashtead's import shipping.

41.     On July 30, 2020, Oberlander emailed Lee asking if she needs any help and reiterating "Please note our bookings are on a very high status desk and will never be rejected."

42.     On July 31, 2020, Lee sent via email the completed and signed application on behalf of Ashtead.

43.     That same day, Oberlander sent an email to Maersk regarding Ashtead stating "Please add the following client as an additional party to our contract."

44.     At no time did any Defendant present to either Plaintiff any document or agreement that stated or implied the Association could add additional fees at its own discretion.

45.     By this time, late July - early August, space in the shipping industry was tightening and the parties were aware that there may be availability issues in the future.

46.     On August 10, 2020, less than a month after the Plaintiff joined the Association, Oberlander emailed members reiterating that "As the association director, I am here to support your bests interest." She further informed them that even though there are roll overs[1] of containers happening in the industry, "[i]f you need help protecting your cargo, please send us an email and will work on protecting your space."

47.     August 12, 2020, two days after sending an email about roll overs in the shipping industry, Oberlander emailed YSN asking YSN to increase the amount of container bookings they were placing through Association contracts.  In response to Oberlander's request and in reliance on the Membership Agreement's stated price, YSN proceeded to switch over the bulk of their container bookings to go through the Association.

48.     On September 13, 2020 certain orders YSN placed with Maersk were cancelled.  In response to an inquiry from YSN, on September 14, 2020, Oberlander emailed YSN that the Association opened the portal to too many users and had went over its allocation with Maersk. Maersk would only be honoring the quantity of containers committed to in the agreement and not more and the Association would "set a plan for a certain amount of committed containers per week per association member, so [the Members can] share [the Association's] space equally."

---

[1] A roll over is when a shipping company holds a container in port.  Many times, this is because of a lack of space on the vessel and the container will be "rolled over" to the next available ship.

49.    At this point, September 2020, the major shipping companies responded to the shortage of space by strictly enforcing all contracted for spaces allocated on their ships and greatly increasing prices for unallocated, if any, space.

50.    Therefore, by October of 2020, even if the Plaintiffs were to try and secure space on other shipping lines, they would likely not be able to get space at all and any limited available space would be at drastically inflated prices.

51.    On October 27, 2020, Oberlander sent YSN an email saying she wanted to handle YSN's customs clearance for incoming containers.

52.    YSN replied that they will consider it if the pricing is comparable to what they were paying to other service providers.

53.    October 28, 2020, a phone call between Newman and Oberlander took place during which Oberlander threatened to throw YSN out of the Association unless YSN allowed Oberlander to handle the customs clearance.  She also said she wanted to charge an extra $100 to $150 per container for a management fee.  Newman told her that this is was breach of the current agreement and is rejected.

54.    Oberlander also requested that Ashtead switch to using her custom clearing services.

55.    On November 9, 2020, Oberlander emailed the Members that they will need to pay an extra $1000 per container in order to get a "sea priority feature via Maersk" to secure booking.

56.    After the November 9, 2020 email, Newman spoke with a high-ranking representative at Maersk and Maersk confirmed that they have not changed their agreement with the Association and this fee was not from them.  He further said that there is a freeze on any new contracts or changes to existing contracts.  Any new rates would have to be filed with the Federal

Maritime Commission and that was not going to happen until well into next year, 2021, when the congestion is supposed to end.

57.    In response to Oberlander's November 9 email, Lee made a request to utilize the "sea priority feature via Maersk."

58.    Oberlander responded that Lee notify Oberlander so Oberlander can create a priority tag.  Lee emailed Maersk/Twill asking them how to create the new booking with this priority feature.

59.    Paul Wills from Maersk responded to Lee "I do not know of this surcharge. We will apply your contract rates for all shipments within the United Shippers Association weekly allocation."

60.    Oberlander sent an email only to Lee leaving all others off the email chain stating that "[t]his is a service provided by United Shippers and not supported by our platform host Twill. We have already taken appropriate action to mark this shipment "HOT".

61.    After learning these fees were not from Maersk, as previously indicated by Oberlander, on November 17, 2020 representatives of Ashtead called Oberlander to object to the fees.

62.    Oberlander responded that she will have her lawyer respond to all Ashtead's questions as she did not want to say the wrong thing.  No follow up from her lawyer was forthcoming.

63.    On November 30, 2020, the Association, through Green, sent Ashtead an Invoice in the amount of $15,000 for the fraudulent "sea priority feature via Maersk."

64.    On November 16, 2020, Oberlander emailed the members of the Association that they will need to pay an extra management fee of $1200 per FEU starting December 1, 2020 if

they want to continue shipping with Maersk.  In this email she requested that the Members sign an amendment to the application form to change the agreed upon fees.

65.     Newman again spoke with Maersk and confirmed that this fee was not coming from them.

66.     On November 20, YSN, through counsel, wrote to the Defendants demanding they honor the contracts that were executed.

67.     On November 23, the Defendants, through counsel, replied to the November 20 letter, reiterating the Defendants' position that they could charge these "management fees" under the Association's bylaws.

68.     On November 24, YSN's counsel replied to Defendants' counsel demanding they honor the contracts that were executed.

69.     On November 24, 2020, Newman again spoke with Maersk, who confirmed that they were offering spot rates and not signing any new contracts for at least another 2-4 months.

70.     Maersk stated they are strictly holding everyone to their allocation, and companies that are not using their contractual allocation, they are taking that allocation away from them.  This means that unless Association members are able to utilize the Association's agreement with Maersk they will not be able to ship with Maersk.

71.     November 25, 2020 Oberlander sent another email reminding Association members to sign and agree to the new 'agreement' she sent out with the higher "management fees".

72.     On November 25, 2020, counsel for the Defendants' emailed counsel for YSN in which he suggested YSN execute the new agreement while reserving its rights.  He then said that if YSN does not pay the fees, YSN's Membership in the Association will be terminated for cause.

73.    Lee also replied to the November 25, 2020 email objecting to any new fees not being charged by Maersk. In response to Lee's email Oberlander claimed, with no proof, that she incurred additional expenses to justify this new exorbitant fee.

74.    In response for repeated demands from the Plaintiffs and counsel for the Plaintiffs for copies of whatever document would justify the additional fees, on November 30, 2020, counsel for the Defendants sent what the Defendants purport to be the bylaws of the Association to justify the new fees.

75.    The bylaws are silent on many issues related to the timing of any fees.  They do not require the Association to charge any fees.  The bylaws also don't say that the Association can change terms it had previously contractually agreed to.

76.    YSN continued booking shipping via Maersk in accordance with its previous practice.

77.    On December 3, 2020, Green, on behalf of Management and the Association, sent YSN two invoices aggregating to $18,600 in "management fees" for shipments YSN has booked on Maersk but not yet shipped.

78.    On December 7, 2020, Green, on behalf of Management and the Association, sent YSN another invoice for $48,000 in "management fees" for shipments YSN has booked on Maersk but not yet shipped.

79.    YSN anticipates it will be shipping another 375 FEUs and is subject to being charged an additional $450,000 in wrongful fees by the Association.

80.    Ashtead continued booking shipping via Maersk in accordance with its previous practice.

81.    Ashtead anticipates it will be shipping another 15 FEUs per week and is subject to being charged an additional $7,500 per week in wrongful fees by the Association for the foreseeable future.

82.    Defendants did not offer anything new which would justify any additional fees. They entered into a contract with Maersk for certain set fees and certain container amounts. Maersk is following that contract by charging those agreed upon fees for the agreed upon allocation and there are no additional charges put forth by Maersk.

83.    The shipping contract that YSN and Ashtead are using to book and ship containers, is the very same one that was in place from the beginning of their membership in the Association.

84.    Any shortage on allocation of containers from Maersk is only because of mismanagement by Oberlander, who admitted to taking took too many members into the Association, thus using above and beyond the allowed Maersk contract allocation.

85.    The Defendants were at all times fully aware of the allowed allocation from Maersk and the Plaintiffs' needs, having asked the Plaintiffs for their requirement to negotiate the contract with Maersk using the Plaintiffs' size as leverage and specifically requesting that the Plaintiffs increase their business with the Association.

86.    As a result of the tightening in the shipping industry, since Defendants enticed Plaintiffs to ship with them and to increase their shipping with them, Plaintiffs do not have the ability to go back now and get bookings with their prior contracts since they effectively switched almost all their shipping to the Association.

87.    Therefore, if Plaintiffs are not able to continue to ship under the Association, as an importer, their business will effectively be shut down, causing irreparable damage to their business, to customer relations and it will create losses that will be nearly impossible to calculate,

since there will be a lot of cancelled customer purchase orders due to lack of product, and lost good will with many customers, which will have negative financial ramifications for many years to come.

88.     The scheme to charge additional "management fees" is a blatant attempt to extort the Plaintiffs' current inability to obtain shipping from another source.

AS AND FOR A FIRST CAUSE OF ACTION<br>(Breach of Contract - Association)

89.     The Plaintiff repeats and re-alleges the allegations of Paragraphs 1 through 88 as if fully set forth herein.

90.     The Association entered into contracts with the Plaintiffs to arrange shipping with Maersk for only $55 per container charge and specifically stated "no further amounts will be charged to the Member."

91.     The Association is seeking to charge additional fees in excess of the contracted price.

92.     As set forth above, the Association has caused invoices to be sent out seeking payment of such fees.

93.     Demand is hereby made that the Court enter judgment against the Association in favor of the Plaintiffs declaring that the Association may not charge any fees in excess of the $55 per container contracted fee and that the invoices are null and void.

94.     Demand is hereby made that the Court enter judgment against the Association in favor of the Plaintiffs in an amount to be determined for any amounts paid for fees charged in breach of the contract.

## AS AND FOR A SECOND CAUSE OF ACTION
(Breach of Fiduciary Duty - Oberlander)

95.     The Plaintiff repeats and re-alleges the allegations of Paragraphs 1 through 94 as if fully set forth herein.

96.     As the directors of the Association, Oberlander owes a duty to the Association and its members.

97.     By seeking to charge fees in excess of the contracted amounts and expenses of the Association, Oberlander is seeking to enrich herself at the expense of the Plaintiffs and other members of the Association.

98.     Demand is hereby made that the Court enter judgment against Oberlander in favor of the Plaintiffs in an amount to be determined for damages caused by Oberlander's breach of her duties.

## AS AND FOR A THIRD CAUSE OF ACTION
(Anticipatory Breach of Contract - Association)

99.     The Plaintiff repeats and re-alleges the allegations of Paragraphs 1 through 98 as if fully set forth herein.

100.    The Association has threatened to cancel the Plaintiff's membership in the Association, if they fail to pay the additional fees.

101.    As set forth above the fees were not agreed to in any contract.

102.    The Association has not provided any accounting of why these fees are necessary and what expenses they are covering.

103.    Additionally, the procedures for any fees the Association purports to be able to charge under the bylaws are vague.

13

104.    Demand is hereby made that the Court enter judgment against the Association in favor of the Plaintiffs declaring that the Association may not cancel the Plaintiffs' membership interest for failure to pay the additional fees.

AS AND FOR A FOURTH CAUSE OF ACTION
(Tortious Interference – Green, Management and Oberlander)

105.    The Plaintiff repeats and re-alleges the allegations of Paragraphs 1 through 104 as if fully set forth herein.

106.    The Association entered into contracts with the Plaintiffs to arrange shipping with Maersk for only a $55 charge per container and specifically stated "no further amounts will be charged to the Member."

107.    Green, Management and Oberlander are seeking to cause the Association to charge additional fees in excess of the contracted price, for their own benefit.

108.    Green, Management and Oberlander have caused invoices to be sent out seeking payment of such fees.

109.    Green, Management and Oberlander are aware of the contracts between the Plaintiffs and the Association and are purposely interfering in such contracts.

110.    Demand is hereby made that the Court enter judgment against Green, Management and Oberlander in favor of the Plaintiffs in an amount to be determined for such tortious actions.

AS AND FOR A FIFTH CAUSE OF ACTION
(Fraud – All Defendants as to Ashtead)

111.    The Plaintiff repeats and re-alleges the allegations of Paragraphs 1 through 110 as if fully set forth herein.

112.    The Defendants sent an email stating that Maersk was charging a priority fee on certain shipments.

113.    As Maersk and the Defendants admitted such statement was false and the fee is not being charges by Maersk but rather by the Defendants.

114.    In reliance on such statement that Maersk was charging the fee (prior to being made aware of the falsity) Ashtead agreed to pay such fees.

115.    Defendants are now charging Ashtead $15,000 for such fees.

116.    Demand is hereby made that the Court enter judgment against the Defendants in favor of Ashtead declaring that the Ashtead is not liable for the $15,000 in priority fees.

117.    Demand is hereby made that the Court enter judgment against the Defendants in favor of Ashtead in an amount to be determined for any amounts paid for such priority fees.

AS AND FOR A SIXTH CAUSE OF ACTION<br>(Prima Facie Tort – All Defendants as to Ashtead)

118.    The Plaintiff repeats and re-alleges the allegations of Paragraphs 1 through 117 as if fully set forth herein.

119.    Knowing the Plaintiffs inability to obtain other shipping facilities, the Defendants concocted a scheme to charge the Plaintiff additional "management fees" in an exorbitant amount of $1,200 per FUE (nearly 22 times the original fee of $55).

120.    They are using the threat of cancelling the Plaintiffs' membership in the Association as leverage for their scheme.

121.    The additional "management fees" have resulted in invoices for thousands of dollars to already be sent and will incur additional invoices in the future.

122.    There is no basis for these additional fees.

123.    Demand is hereby made that the Court enter judgment against the Defendants in favor of the Plaintiff in an amount to be determined.

WHEREFORE, Plaintiffs, demand judgment against the Defendants as follows:

15

(a)    that the Court enter judgment against the Association in favor of the Plaintiffs declaring that the Association may not charge any fees in excess of the $55 per container contracted fee and that the invoices are null and void;

(b)    that the Court enter judgment against the Association in favor of the Plaintiffs in an amount to be determined for any amounts paid for fees charged in breach of the contract;

(c)    that the Court enter judgment against the Oberlander in favor of the Plaintiffs in an amount to be determined for damages caused by Oberlander's breach of her duties; that the Court enter judgment against the Association in favor of the Plaintiffs declaring that the Association may not cancel the Plaintiffs' membership interest for failure to pay the additional fees;

(d)    that the Court enter judgment against Green, Management and Oberlander in favor of the Plaintiffs in an amount to be determined for their tortious actions;

(e)    that the Court enter judgment against the Defendants in favor of Ashtead declaring that the Ashtead is not liable for the $15,000 in priority fees;

(f)    that the Court enter judgment against the Defendants in favor of Ashtead in an amount to be determined for any amounts paid for such priority fees;

(g)    that the Court enter judgment against the Defendants in favor of Plaintiffs in an amount to be determined for their tortious actions; and

(h)     For such other relief as this Court may determine as fair and just.

Valley Stream, New York            GRUSHKO & MITTMAN, P.C.
Dated: December 8, 2020

By
                                   Eliezer Drew (ED0625)
                                   Attorneys for Plaintiff
                                   515 Rockaway Avenue
                                   Valley Stream, New York 11581
                                   (212) 697–9500
                                   eli@grushkomittman.com